

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00236-CV

**IN THE INTEREST OF T.G.D.**, a Child

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2023PA00299
Honorable Raul Perales, Judge Presiding

Opinion by:      Liza A. Rodriguez, Justice

Sitting:         Luz Elena D. Chapa, Justice (concurring in the judgment only)
                 Liza A. Rodriguez, Justice
                 Lori Massey Brissette, Justice

Delivered and Filed: September 24, 2024

AFFIRMED

Mother and Father appeal from the trial court's judgment terminating their parental rights to their three-year-old child, T.G.D.[1] Mother argues the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the child's best interest. Father argues the trial court violated his due process rights when it discharged his court-appointed attorney during trial and did not appoint another attorney to represent him for the remainder of the trial. We affirm.

---

[1]To protect the identity of the minor child, we refer to the child and the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

On March 3, 2023, the Department of Family and Protective Services ("the Department") filed the underlying suit to terminate Mother's and Father's parental rights, along with an affidavit in support of emergency removal of the child. The Department sought termination of both parents' parental rights because of domestic violence perpetrated by Father against Mother, drug and alcohol abuse by both parents, and the unsafe and unsanitary condition of Mother's house, where the child was living at the time of removal. The trial court appointed the Department the child's temporary sole managing conservator, and the child was placed in the care of her maternal grandparents.

On March 14, 2023, the trial court signed a temporary order appointing an attorney ad litem to represent each parent and ordered each parent to submit to a psychological evaluation, to attend counseling, to participate in and complete parenting classes, to engage in drug and alcohol assessments and testing, and to comply with each requirement in their respective service plans. The trial court's temporary order further warned the above-listed actions were required to obtain the child's return and the failure to fully comply could result in the termination of their parental rights.

On April 12, 2023, Mother and Father met with Department caseworkers and participated in the development of a service plan for each of them. Mother's service plan required her to complete a domestic violence course for victims, participate in a drug and alcohol assessment and follow the recommendations of the assessment, including inpatient drug/alcohol therapy, comply with all random drug and alcohol testing, engage in individual counseling, complete a parenting course, provide proof of employment, and demonstrate she could maintain a safe and stable home for T.G.D. Father's service plan required him to complete a domestic violence course for perpetrators, participate in a drug and alcohol assessment, comply with all random drug and

alcohol testing, engage in individual counseling, complete a parenting course, show proof of employment, and acquire and maintain a safe and stable home for T.G.D.

On February 5, 2024, and March 15, 2024, the trial court held a bench trial, which was conducted in person and by Zoom. In support of its case, the Department presented testimony from three Department employees as well as copies of each parents' service plan and photographs of the interior of Mother's house, which were taken only four days before trial commenced. Additionally, both Mother and Father testified at trial.

**Evidence about Mother**

A Department caseworker, Michelle Gregory, testified the Department was concerned that Mother was an alcoholic, that her alcoholism caused her to be impaired, and that she did not address her alcoholism while the case was pending. Gregory and Mother had discussed Mother's alcohol use, but Mother insisted she did not have a problem with alcohol and claimed she had hypoglycemia, which caused her to shake. Mother never provided her caseworkers with any documentation to support her hypoglycemia claim. Furthermore, Mother never completed the drug and alcohol assessment as required by her service plan and as ordered by the trial court at the beginning of the case. Mother participated in some but not all drug tests requested by the caseworkers. Mother refused to take any hair follicle tests, stating that she did not want her hair to be cut. Mother sometimes claimed she was unable to drug test because she had transportation problems.

Despite Mother's contention that she was not an alcoholic, a Department investigator, Robert Green, testified that on January 31, 2024—just five days before the first day of trial—he saw Mother drinking alcohol behind a convenience store across the street from the Department's office. When Green approached Mother and spoke to her, he smelled alcohol on her breath and he

saw that her hair was messy and her eyes were glossy and red. According to Green, Mother appeared to be intoxicated.

At the end of the first day of trial, the trial court ordered Mother to take a drug test at the courthouse that afternoon, but Mother did not comply. Mother testified she did not comply because she "already had prior plans."

Another important component of the Department's case was the unsafe and unsanitary conditions of Mother's house. At the beginning of the case, Gregory observed that Mother's house had no refrigerator and contained little food. It also contained obviously unsafe conditions for a young child, including a gas cannister and power tools out in the open and exposed wood in the backyard. Gregory acknowledged that while the case was pending Mother made a few improvements to her house, such as getting the bathroom in working condition. However, Mother refused to allow Gregory to see the entire house. The parts of the house Mother did allow Gregory to see were "pretty dirty" and unsafe.

Another Department caseworker, Alkeshia Daniels, testified about Mother's lack of cooperation in allowing her access to her house. In the two months preceding trial, Daniels attempted to visit Mother's house twice, but no one answered the door. Daniels then made an appointment with Mother to visit her house on February 1, 2024, at 11:00 a.m. The day before, Daniels confirmed the appointment with Mother. But when Daniels arrived at the house at the agreed upon time, Mother was not there. Shortly thereafter, Daniels saw Mother walking away from her house. Daniels called Mother and reminded her about their appointment.

After a delay of more than an hour, Daniels encountered Mother just outside her house. Mother was surprised to see Daniels. When Daniels asked Mother for access to her house, Mother asked Daniels to come back later that day. Daniels refused, and Mother eventually allowed her to enter the house. Once inside, Daniels observed broken glass all over the kitchen floor, dirty dishes

stacked in the sink, an empty refrigerator in the living room and blocking the door path, chain saws and other tools cluttering the living room floor, dried dog feces on the floor, a filthy foam mattress in T.G.D.'s bedroom, and empty beer cans and wine bottles littering the bed in Mother's bedroom. Daniels took photographs of the inside of Mother's house, which were admitted into evidence at trial. Despite the broken glass and the empty alcohol containers, Mother denied that she had consumed any alcohol. Mother claimed her friends had consumed the alcohol, and they had caused the mess.

Mother's participation in individual counseling, which was required by her service plan, was mixed. At the beginning of the case, her attendance was inconsistent. In the middle of the case, in October and November 2023, she attended sessions regularly. Near the end of the case, in February 2024, Mother did not attend any sessions. Mother's therapist told one of the caseworkers, Daniels, that she could not advocate for Mother to have T.G.D. back at the time of trial.

Mother was permitted to visit T.G.D. every other week. For the majority of the case, Mother attended these visits, although she sometimes arrived late. However, in the two months preceding trial, Mother missed two of her scheduled visits. Additionally, Gregory testified that Mother's conduct during visits was not appropriate. T.G.D. had a lot of energy, and she wanted to play, but during visits Mother would "coddle" the child "to the point where she was clearly not wanting to be in [Mother's] arms." Gregory urged Mother to adjust her behavior, but Mother refused. Instead, Mother justified her behavior, telling Gregory she was "just trying to get cuddles from her daughter." In those moments, Gregory believed that Mother was not trying to give T.G.D. what she needed, but instead was trying to get what she wanted from T.G.D.

Domestic violence was another important issue in the case. While the case was pending, Father was convicted of domestic violence against Mother. By the time of trial, Mother and Father were no longer in a relationship, and Mother had obtained a protective order against Father.

However, according to her service plan, Mother was also required to address this issue by completing a domestic violence course for victims. While Mother did attend a few domestic violence classes, she did not complete the course. Mother testified that the only reason she was unable to complete the domestic violence course was because of "communication issues."

Before the Department filed its termination suit, Mother had completed a parenting class. At trial, Mother claimed her previously completed parenting class fulfilled the requirement in her service plan, but the Department disagreed. Finally, although her caseworkers asked Mother to provide them with proof of employment as required by her service plan, Mother failed to do so.

**Evidence about Father**

The evidence showed that Father had been convicted of domestic violence against Mother and was sentenced to a year of probation. However, Father never enrolled in a domestic violence course as required by the service plan and as ordered by the trial court. Additionally, Father never enrolled in a parenting class as required by his service plan. Father was referred to two different therapists for individual counseling. He was unsuccessfully discharged by the first therapist for sending inappropriate text messages. He never showed up for his session with the second therapist.

Father did complete a drug assessment, which was based on self-reported information. According to the drug assessment, Father did not qualify for any drug services or treatment. Father submitted to some of the random drug tests requested by the caseworkers but not all of them. According to Gregory, the results of one of Father's drug tests were "concerning." Gregory also testified that when she asked Father to complete a hair follicle test, he refused because he "did not feel like doing it." Finally, on the first day of trial, the trial court ordered Father to take a drug test at the courthouse, but Father failed to comply.

Near the end of the case and shortly before trial, Father made two appointments to meet with Daniels at the Department's office, but he failed to show up for both appointments. However, Father did provide Daniels with proof of employment.

Father attended most of his scheduled visits with T.G.D. Gregory characterized Father's visits as "somewhat appropriate." However, Gregory observed that Father would merely watch T.G.D. play without interacting with her. Gregory encouraged Father to sit on the floor and interact with T.G.D., but he did not modify his behavior. However, Daniels testified that Father did engage with T.G.D. during his visits. Since Daniels had become the caseworker in January 2024, Father missed two of his visits with the child.

Father lived at multiple residences, including his mother's house and his stepmother's house. Gregory visited both houses and observed that neither house seemed to have any room for T.G.D. to stay there. She also noticed a big hole in the wall at his mother's house. Father informed the caseworker that if he was reunited with T.G.D., they would live at his stepmother's house.

**Evidence about the Child**

The evidence showed that T.G.D. had been living with her maternal grandparents for more than a year. When T.G.D. was removed from Mother's house, she had food insecurity issues, which included not eating unless she had two things in her hands, hiding food, and gorging. Her grandparents worked with T.G.D. to overcome her food insecurities, and she was improving in this area. T.G.D. was in speech therapy and was becoming more talkative. She had some behavioral issues, such as biting, hitting, and spitting. However, when T.G.D. engaged in these behaviors, her grandmother was able to redirect her. Additionally, the child's daycare and play therapy were helping to address these behavioral issues.

Daniels testified she had observed T.G.D.'s relationship with her grandparents and the child was "extremely bonded" with them. T.G.D. called her grandparents "mom" and "papa."

Overall, her grandparents were taking care of T.G.D.'s physical and emotional needs and providing her with a safe and stable home. And, in the event Mother's and Father's parental rights were terminated, the grandparents planned to adopt T.G.D.

**Trial Court's Ruling**

After hearing all the evidence, the trial court terminated Mother's parental rights on grounds she (1) constructively abandoned the child, (2) failed to comply with a court-ordered service plan, and (3) used a controlled substance in a manner that endangered the child's health and safety and failed to complete a court-ordered substance abuse treatment program. *See* TEX. FAM. CODE § 161.001(b)(1)(N),(O),(P). The trial court terminated Father's parental rights on grounds he (1) constructively abandoned the child and (2) failed to comply with a court-ordered service plan. *See id*. § 161.001(b)(1)(N),(O). The trial court also found that termination of Mother's and Father's parental rights was in the best interest of the child. *See id*. § 161.001(b)(2). The trial court signed a judgment terminating Mother's and Father's parental rights to T.G.D. Mother and Father appealed.

MOTHER'S APPEAL

In her sole issue, Mother argues the evidence is legally and factually insufficient to support the trial court's best-interest finding. *See id*.

**A. Standard of Review**

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *Id.* In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm

belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 346.

## B. Best Interest of the Child

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307(b).[2] *See* TEX. FAM. CODE § 263.307(b). In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[3] The *Holley* factors are neither all-encompassing nor

---

[2]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[3]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental

does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet. denied) (noting that a best-interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.A.R.*, 672 S.W.3d at 722; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

**C. Analysis**

On appeal, Mother does not challenge the predicate grounds for termination—that she constructively abandoned T.G.D., that she failed to complete her court-ordered service plan, and that she used a controlled substance in a manner that endangered the child's health and safety and failed to complete a court-ordered substance abuse treatment program. Accordingly, these predicate grounds for termination are also probative of T.G.D.'s best interest. *See In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

By the time of trial, Mother had not started the process of addressing her substance abuse issues. Mother's service plan required her to participate in a drug and alcohol assessment, but

___

abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

Mother never did so. Mother also did not submit to all drug testing requested by the caseworkers, and she did not submit to drug testing when it was specially ordered by the trial court. From this evidence, the trial court was entitled to infer that Mother was in fact abusing alcohol and/or other substances. *See In re E.A.R.*, 672 S.W.3d at 723 ("The trial court, however, could infer that Father failed to submit to drug testing because he was using illegal drugs."); *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A] fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."). "A parent's illegal drug use supports a finding that termination of the parent-child relationship is in the best interest of the child." *In re A.M.O.*, No. 04-17-00798-CV, 2018 WL 2222207, at *2 (Tex. App.—San Antonio, May 16, 2018, no pet.).

In addition to the inferences arising from Mother's refusals to drug test, other evidence exhibited Mother's substance abuse problems. For example, a Department investigator saw that Mother was intoxicated in public on January 31, 2024, and a Department caseworker saw that Mother's house was littered with empty alcohol bottles and broken glass on February 1, 2024.

"In determining a child's best interest, the trial court is permitted to consider whether a parent complied with a service plan." *In re N.L.R.*, No. 04-23-01020-CV, 2024 WL 1184462, at *4 (Tex. App.—San Antonio Mar. 20, 2024, no pet.). A history of domestic violence and the failure to take a domestic violence course or engage in a domestic violence program supports a best interest finding. *In re M.C.L.*, No. 04-21-00276-CV, 2022 WL 218998, at *6 (Tex. App.—San Antonio Jan. 26, 2022, no pet.). Here, Mother failed to complete domestic violence classes as required by her service plan. Additionally, Mother's participation in individual counseling, which was also required by her service plan, was inconsistent during the pendency of the case. The trial court could have reasonably determined Mother's failure to engage in and complete many of her services showed her uncooperativeness and unwillingness to effectuate the personal changes

necessary to obtain T.G.D.'s return. *See In re M.R.J.M.*, 280 S.W.3d 494, 506, 510-11 (Tex. App.—Fort Worth 2009, no pet.) (noting father's failure to effect personal and environmental changes until immediately before trial supported best-interest finding); *In re J.I.T.P.*, 99 S.W.3d 841, 847 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering parent's uncooperativeness and failure to complete counseling services in reviewing sufficiency of best-interest finding).

Underscoring Mother's lack of progress in effectuating personal changes was evidence that Mother's therapist could not recommend that T.G.D. be returned to Mother at the time of trial. Although the evidence showed that Mother attended most of her visits with T.G.D., Mother missed two visits with T.G.D. in February 2024, which was after the trial had commenced. Additionally, during her visits with T.G.D., Mother's behavior was described as inappropriate. Gregory described an incident in which Mother put her own needs above T.G.D.'s needs. The trial court could have reasonably determined Mother lacked adequate parenting skills and was unable or unwilling to understand T.G.D.'s needs and capabilities. *See* TEX. FAM. CODE § 263.307(b)(12)(F).

One of the goals in Mother's service plan was for Mother to demonstrate that she could maintain a safe and stable home for T.G.D. Daniels testified that she compared photographs depicting Mother's house when T.G.D. was removed with photographs depicting Mother's house just days before trial began, and she noticed no changes in the house's condition. Daniels added that the room where T.G.D. was supposed to sleep was "definitely not appropriate." Based on the caseworkers' testimony and the photographs of Mother's house, the trial court could have determined that Mother was either unwilling or unable to provide the child a safe physical home environment, which was a factor in determining T.G.D.'s best interest. *See In re A.J.W.*, No. 04-17-00682-CV, 2018 WL 1733172, at *4 (Tex. App.—San Antonio Apr. 11, 2018, no pet.) (detailing that best interest finding was supported in part by "disturbing nature" of room where parent and child had resided, which included dirty diapers on the floor, broken glass, clothes all

over the floor, and no food); *In re L.K.*, No. 12-13-00201-CV, 2013 WL 6388472, at *7 (Tex. App.—Tyler Dec. 4, 2013, no pet.) (concluding evidence of boxes stacked taller than the child, dishes piled up in the kitchen sink, trash on the floor, clutter all over counter, and furniture stacked up in every room demonstrated that home was not safe for a two-year-old child and supported best interest finding); *see also* TEX. FAM. CODE § 263.307(b)(11) (recognizing willingness and ability of parent to effect positive environmental and personal changes within a reasonable period of time is relevant to determining whether parent is willing and able to provide the child with a safe environment).

As to the child and her current placement, the evidence showed that following her removal T.G.D. suffered from food insecurities, delayed speech, and behavioral issues. All three concerns were being addressed by her grandparents and T.G.D. was showing progress in these areas. Daniels testified that T.G.D. was "a bright," "smart," "little girl" who was "making some great progress but she still has some work to go." She added that "with some consistency in her schedule and her therapy, she will get there." According to Daniels, her grandparents were "doing everything in their power to make sure [T.G.D.] gets all the help that she needs." "When a child is too young to express her desires, the factfinder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). According to Gregory, T.G.D. was not bonded with Mother, but she was bonded with her grandparents, who had been taking care of the child's physical and emotional needs and providing her with a safe and stable home for more than a year and who planned to adopt her if Mother's and Father's parental rights were terminated.

After reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that the termination of Mother's parental rights was in T.G.D.'s best interest. Additionally, the disputed evidence that

a reasonable factfinder could not have credited in favor of the finding was not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest. Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's sole issue.

FATHER'S APPEAL

In his sole issue, Father argues his right to due process was violated when the trial court discharged his court-appointed attorney during trial and did not immediately appoint him another attorney. Father argues he was entitled to an appointed attorney under both section 107.013(a)(1) of the Texas Family Code and *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N. C.*, 452 U.S. 18 (1981).

## A. Relevant Factual Background

At the inception of the case, Father was appointed an attorney ad litem, Sheri Bryce Dye, to represent him. The temporary order signed by the trial court on March 14, 2023, recites that the Department sought termination of Father's parental rights "pursuant to § 161.003(a)" of the Texas Family Code and, therefore, "appointment of an attorney ad litem for this parent is required by § 161.003(b)" of the Texas Family Code.[4]

---

[4]Section 161.003 provides for termination of parental rights when, among other things, a parent "has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child." TEX. FAM. CODE § 161.003(a)(1). Section 161.003(b) states:

> Immediately after the filing of a suit under this section, the court shall appoint an attorney ad litem to represent the interests of the parent against whom the suit is brought.

*Id*. § 161.003(b). On appeal, Father does not argue the trial court violated section 161.003(b) by not immediately appointing him another attorney, and therefore, that issue is not before us. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) ("It is axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error."); *Thomas v. Logic Underwriters, Inc.*, No. 02-16-00376-CV, 2017 WL 5494386, at *6 (Tex. App.—Fort Worth Nov. 16, 2017, pet. denied) (recognizing appellate court is "bound to address only the issues" "raised in [an appellant's] brief"); *In re N.B.*, No. 07-15-00038-CV, 2015 WL 4481704, at *5 (Tex. App.—Amarillo July 22,

On February 5, 2024, the first day of trial, Ms. Dye appeared on Father's behalf. On March 15, 2024, the second day of trial, Ms. Dye announced not ready and stated: "Your Honor, my client has informed me today that he wishes to have other counsel. He would like to have a second opinion and does not want me to represent him any further in this matter." After the Department expressed its opposition to Father's request, the trial court stated, "I'm going to deny that at this time, Ms. Dye. We do have to move forward. We are in the middle of trial."

Trial resumed with two witnesses testifying on the Department's behalf. Ms. Dye cross-examined both witnesses. When the Department's final witness started testifying, the trial court noticed Father was no longer present by Zoom. Thereafter, Ms. Dye called Father on the phone, talked to him, and told the trial court that Father "has exited the hearing. He says that I should inform the Court that when they're ready to speak with him, he'll make himself available….[H]e indicates that he would like to be heard on a different day, and that it is his wish that his rights not be terminated today." After thanking Ms. Dye for the update, the trial court directed the Department's attorney to continue examining the witness.

Later, during the same witness's testimony, Ms. Dye stated:

> Excuse me, [Y]our Honor. Excuse me. I apologize for interrupting.
>
> I am receiving some communications that are concerning to me at this time, and I just need to make the court aware of that.
>
> I am being told that I am to be fired immediately; not to represent [Father] as of immediately; let the Court [be made] aware of this immediately, and that his rights better remain intact today or else—there are things that are being stated.
>
> So I'm just making you aware that he wants me to make the Court aware of that, and I am being asked to stipulate that. I've given him [the court's phone] number and the Zoom ID as well.

---

2015, pet. denied) ("An appellate court cannot reverse a trial court's decision on a ground not presented in the appellate briefs, i.e., 'unassigned error.'").

The trial court again thanked Ms. Dye for the information and directed the Department's counsel to continue examining the witness. Shortly thereafter, Ms. Dye stated:

> Your Honor. I – I apologize for interrupting again.
>
> I need to request that the attorneys and I [] speak with you privately. I need to address the Court privately.

The trial court then took a recess to meet with the attorneys in chambers. After the recess, the trial court stated:

> Just for the record, Ms. Dye represents [Father]. [Father] had disconnected multiple times today.
>
> We took a brief recess to allow Ms. Dye some time to get her client back into the hearing. Ms. Dye has advised the Court that he would rather not participate, but could be available if we need him.
>
> Once again, we asked Ms. Dye to reach out to him.
>
> Ms. Dye has stated for the record that at this point she's finding it very difficult to work with her client. He's being very condescending, and frankly, I think it's a scary situation.
>
> I don't intend for Ms. Dye to have to put up with this. I've got grave concerns.
>
> I'm going to discharge Ms. Dye, and we're going to proceed.
>
> Ms. Dye, the last duty I'm going to ask of you is to reach out to your client and let him know that I have discharged you and he can join us by Zoom; and I'm expecting him to, and I'll be looking for him. If he chooses not to . . . that's his decision.

After Ms. Dye was excused by the trial court, Father re-joined the trial by Zoom. Father, appearing pro se, cross-examined the Department's final witness and testified on his own behalf.

After the trial ended, the trial court signed an order substituting another attorney to represent Father on appeal. Father subsequently filed—for the first time—a statement of inability to pay costs.

**B. Right to Appointed Counsel**

In a termination suit filed by the government, the Texas Family Code requires the trial court to appoint an attorney ad litem to represent the interest of an indigent parent who responds in opposition to the termination. TEX. FAM. CODE. § 107.013(a)(1) ("In a suit filed by a governmental entity . . . in which termination of the parent-child relationship is requested . . . the court shall appoint an attorney ad litem to represent the interests of an indigent parent of the child who responds in opposition to the termination."). However, the Texas Supreme Court has held that a parent's right to appointed counsel based on indigency does not become mandatory until he files an affidavit of indigence and is determined to be indigent by the trial court. *In re B.C.*, 592 S.W.3d 133, 136 (Tex. 2019) ("[T]he court is required to appoint counsel under subsection (a) only when an affidavit of indigence has actually been filed and the trial court has determined the parent is truly indigent."); *In re J.S.*, No. 09-15-00150-CV, 2015 WL 5731643, at *10 (Tex. App.— Beaumont Oct. 1, 2015, no pet.) (holding parent "failed to properly initiate the process for which his appointment of counsel would become mandatory" when she did not file affidavit of indigence under 107.013(a)(1)).

In the present case, when Father asked the trial court to appoint him another attorney, he had not filed an affidavit of indigence, which was necessary to trigger the process for mandatory appointment of counsel under section 107.013(a)(1). *See In re B.C.*, 592 S.W.3d at 136; *see also In re J.C.*, No. 06-00042-CV, 2023 WL 2319410, at *2-4 (Tex. App.—Texarkana March 2, 2023, pet. denied) (concluding no due process violation when parent's first appointed attorney was discharged, and trial court did not appoint another attorney until three days before trial because of parent's delay in filing her affidavit of indigence). Because the filing of an affidavit of indigence was necessary to trigger the process for mandatory appointment of an attorney ad litem under

section 107.013(a)(1), we conclude Father's due process rights under section 107.013(a)(1) were not violated. *See In re B.C.*, 592 S.W.3d at 136.

Next, Father complains the trial court's failure to appoint another attorney ad litem for him violated his federal due process rights under *Lassiter*. *See* 452 U.S. at 27-33. In *Lassiter*, the United States Supreme Court held that the United States Constitution does not require the appointment of an attorney to represent an indigent parent in every termination suit. *Id*. at 31. However, the Court held that due process may require the appointment of an attorney in some termination suits. *Id*. Additionally, the Court acknowledged even though the appointment of an attorney was not constitutionally required in every termination case, thirty-three states and the District of Columbia already "provide[d] statutorily for the appointment of counsel in termination cases" and it approved of this practice as "enlightened and wise." *Id*. at 34.

In Texas, *Lassiter*'s analysis typically comes into play when section 107.013(a)(1) is not applicable. *See, e.g.*, *In re R.J.C.*, No. 04-09-00106-CV, 2010 WL 816188, at *3 (Tex. App.—San Antonio 2010, no pet.). In *In re R.J.C.*, a father argued that due process entitled him to a court-appointed attorney in a termination suit filed not by a governmental entity but by the child's mother. *Id*. We concluded that section 107.013(a)(1)'s mandatory appointment requirement did not apply to father because the termination suit was not filed by a governmental entity. *Id*. In lieu of applying section 107.013(a)(1), we applied *Lassiter*'s due process analysis and ultimately determined that father was not entitled to a court-appointed attorney. *Id*. at *4.

In *Lassiter*, the trial court terminated an indigent mother's parental rights to her child without appointing a lawyer to represent her. 452 U.S. at 22, 24. The mother had been convicted of second-degree murder and was serving a prison sentence of 25 to 40 years. *Id*. at 20. On appeal, the United States Supreme Court considered the circumstances surrounding the termination case to determine if due process entitled the mother to a court-appointed attorney. First, the Court

determined that the mother did not require an attorney because there were no allegations of child abuse or neglect upon which criminal charges could be based. *Id*. at 32. Second, the Court concluded the absence of an appointed attorney was not fundamentally unfair because no expert witnesses testified at trial, and the case did not involve any troublesome points of law. *Id*. Third, the Court noted that some hearsay was admitted at trial and Mother's defense that the Department had not adequately assisted her in rekindling her interest in her child was "incomplete," but reasoned that because the weight of the evidence showed that the mother had demonstrated little interest in rekindling her relationship with her child, the presence of an appointed attorney at trial would not have made a determinative difference. *Id*. at 32-33. Finally, the Court recognized that the mother had failed to attend hearings in the termination case, which called into question her desire to contest the termination. *Id*. at 33. The Court ultimately concluded that under the circumstances presented, due process did not require the appointment of an attorney to represent the mother. *Id*.

In the present case, Father argues he was entitled to the appointment of another attorney under *Lassiter*. Specifically, Father argues the evidence showed he could be subject to future prosecution, his termination case presented "troublesome points of law," and the appointment of another attorney during trial would have "made a determinative difference" in the outcome of his case. We disagree. First, the record shows Father was not subject to future prosecution. *See id*. at 32. Father had already been convicted of the domestic violence charge involving Mother and he was serving his sentence at the time of trial. Second, no complex legal issues were presented at trial. *See id*. To the contrary, the Department's case was a standard termination case involving well-settled legal principles. Third, the appointment of another attorney at the end of trial would not have made a determinative difference in the outcome of the case. *See id*. at 32-33. The undisputed evidence showed that Father failed to engage in most of his service plan and he refused

to submit to drug testing even when directly ordered to do so by the trial court. Plus, Father had the benefit of a court-appointed attorney for most of the time the termination suit was pending. Ms. Dye represented Father at the initial adversary hearing and continued to represent him up to and during most of the trial. The trial court discharged Ms. Dye only after Father made it clear that he did not want her to represent him anymore and after Father's conduct toward her presented a "scary situation," causing the trial court to have "grave concerns." Finally, some of Father's actions—such as missing a pretrial hearing[5] and voluntarily absenting himself from the proceedings during trial—called into question his desire to contest the termination. *See id.* at 33.

After applying *Lassiter*'s due process analysis, we conclude the trial court did not err by not appointing Father a second attorney. *See id.* (holding trial court did not err in failing to appoint counsel for indigent parent in termination suit); *In re R.J.C.*, 2010 WL 816188, at *4 (same). We overrule Father's sole issue.

## CONCLUSION

For the reasons stated above, we affirm the trial court's termination judgment.

Liza A. Rodriguez, Justice

---

[5]An order signed on December 22, 2023, states Father did not appear at the December 19, 2023 permanency hearing.